## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

### BID PROTEST

| | | |
|---|---|---|
| SARONIC TECHNOLOGIES, INC. | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. _____ |
| THE UNITED STATES | ) ) | Judge _____ |
| Defendant. | ) ) ) ) | Redacted Version |

### COMPLAINT

Plaintiff Saronic Technologies, Inc. ("Saronic") by counsel, files this Complaint for Declaratory Relief against Defendant, the United States of America, and states as follows:

### PARTIES

1.    Plaintiff Saronic is a Delaware corporation with its principal place of business located at 510 Saint Elmo Road, Suite A-2, Austin, Texas 78745. Saronic is a small business that operates in the maritime sector focusing on autonomous surface vessels.

2.    Defendant is the United States of America (the "Government"), acting by and through the Naval Sea Systems Command ("NAVSEA" or "Agency").

### NATURE OF ACTION

3.    This is an action for declaratory and injunctive relief pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1).

4.    Saronic protests NAVSEA's issuance of solicitation N00024-26-R-6311 (the "Solicitation") for Operations and Sustainment ("O&S") for the Littoral Combat Ship ("LCS")

Mission Modules ("MMs") and small Unmanned Surface Vehicles ("sUSVs") as a FAR Part 15, non-commercial procurement.

5.    The Solicitation combines O&S for the LCS MM and sUSVs even though these are separate and distinct systems operated by the Navy.

6.    According to the Navy's website, the LCS is "a fast, agile and networked surface combatant, optimized for operating in the littorals. The primary missions for the LCS include countering diesel submarine threats, littoral mine threats and surface threats, such as small surface craft attacks, to assure maritime access for joint forces."[1] LCS ships are typically crewed warships.

7.    By contrast, the sUSV Family of Systems consists of several autonomous sUSVs the Navy and private industry have developed.[2]

8.    Saronic developed a commercially available sUSV, the services for which were included in the solicitation in question.

9.    Saronic challenges the Solicitation on three grounds.

10.    First, the Agency failed to follow 10 U.S.C. § 3453, Preference for Commercial Products and Commercial Services, and Executive Order 14271, "Ensuring Commercial, Cost-Effective Solutions In Federal Contracts," when issuing the Solicitation. Section 3453 and

---

[1] Littoral Combat Shops – Mission Modules, last updated July 2, 2025, *available at* https://www.navy.mil/Resources/Fact-Files/Display-FactFiles/Article/2167494/littoral-combat-ships-mission-modules/

[2] Small Unmanned Surface Vehicles (sUSV) Family of Systems (FoS), last updated August 28, 2025, *available at* https://www.navy.mil/Resources/Fact-Files/Display-FactFiles/Article/4288613/small-unmanned-surface-vehicles-susv-family-of-systems-fos/

Executive Order 14271 establish a mandatory preference for acquiring commercial products and commercial services to the maximum extent practicable to meet the Government's requirements. Agencies are required to (1) conduct market research to determine whether there are commercial products or commercial services that are suitable to meet the agency's requirements; (2) define their requirements and specifications so that commercial products and services can fulfill such requirements, and (3) seek approval if they propose to solicit non-commercial products and services. The Agency failed to follow these requirements. Instead of identifying and segregating services that could be fulfilled by commercial service providers, the Agency bundled together a variety of tasks for the LCS and sUSVs that, when combined, can only be performed by a large, non-commercial, traditional defense contractor. Additionally, the Agency incorporated terms and conditions into the Solicitation that preclude commercial service providers from competing, and in some cases, actually penalize offerors for offering commercial services with their commercial terms.

11.    Second, the Solicitation contains certain terms that unduly restrict competition. Specifically, the Agency's decision to combine the O&S services for the LCS and sUSVs unduly restricts competition to only large, traditional defense contractors and does not serve the Agency's needs because the LCS and sUSVs are separate systems requiring different services that do not need to be combined in one contract. The Solicitation's cost disclosure requirements unduly restrict competition by prohibiting commercial and nontraditional government contractors from competing because they cannot provide the required cost data. The Solicitation's data rights requirements unduly restrict competition because the Solicitation states that offerors who provide less than Government Purpose Rights ("GPR") in commercial or non-commercial technical data,

computer software, and computer software documentation will be evaluated unfavorably in the best value determination. Thus, commercial contractors are effectively prohibited from offering their commercial data under commercial data rights terms.

12.     Third, the Agency should have set aside the sUSV O&S portion of the Solicitation for small businesses because at least two small businesses could perform the work. In fact, there are multiple small businesses that sell sUSVs and could perform these types of services.

## JURISDICTION AND STANDING

13.     The Court has jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. § 1491. Under the Tucker Act, the Court possesses jurisdiction to adjudicate bid protests challenging, *inter alia*, "an action by an interested party objecting to . . . a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award . . . or any alleged violation of statute or regulation in connection with a procurement." 28 U.S.C. § 1491(b)(1). The term "procurement" is itself broad, meaning "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout." 41 U.S.C. § 111; *see also Nat'l Air Cargo Grp. v. United States*, 126 Fed. Cl. 281, 289 (2016) (citing *RAMCOR Servs. Grp., Inc. v. United States,* 185 F.3d 1286, 1288-89 (Fed. Cir. 1999)). Thus, the Court has "jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded." 28 U.S.C. § 1491(b)(1). However, where a party has the opportunity to object to the terms of a government solicitation prior to the close of the bidding process, it must do so at that time or else "waive[ ] its ability to raise the same objection afterwards. *Blue & Gold Fleet, L.P. v. U.S.*, 492 F.3d 1308, 1315 (Fed. Cir. 2007). Additionally, "[t]o afford relief in such an action," the Court "may award

any relief that the court considers proper, including declaratory and injunctive relief." 28 U.S.C. § 1491(b)(2).

14.    Saronic has standing to bring this protest because it is an interested party filing a challenge to the Solicitation before the Solicitation's closing date for receipt of proposals. *See* 28 U.S.C. § 1491(b)(1) (providing that the Court "shall have jurisdiction to render judgement on an action by an interested party"). A party is "interested" if (a) it is "an actual or prospective bidder with a direct economic interest in the procurement," and (b) was "prejudiced by a significant error in the procurement process." *Trax Int'l Corp. v. United States*, 144 Fed.Cl. 417, 428 (2019) (cleaned up).

15.    The Court has explained that a party can show prejudice where it sustained a "non-trivial competitive injury which can be addressed by judicial relief." *Weeks Marine Inc. v. U.S.*, 575 F.3d 1352, 1362-63 (2009). In other words, in considering whether a non-trivial competitive injury has been sustained, Saronic must demonstrate that the Agency's improper decision to utilize competitively restrictive, non-commercial procedures, "would prejudice [it] by imposing a significant competitive disadvantage." *Zolon PCS II, LLC v. United States,* 172 Fed. Cl. 742, 759 (2024) (citing *ICP Nw., LLC v. United States*, 98 Fed. Cl. 29, 36 (2011)).

16.    Here, Saronic is an interested party because it is a responsible offeror that would submit a proposal for the services for the commercial sUSVs if the Agency properly defined the requirements to allow commercial contractors to compete for commercial services and had not excluded contractors, like Saronic, with terms that are unduly restrictive of competition. Saronic downloaded and reviewed the Solicitation, intended to compete, and began assessing the requirements. However, Saronic concluded it could not fairly submit a proposal due to the terms

and conditions challenged herein. In other words, Saronic would possess a substantial chance of award but for the errors alleged in this Complaint. Additionally, Saronic timely files this complaint before 4:00 PM ET, March 4, 2026, the closing date and time for proposals.

## FACTUAL BACKGROUND

### Saronic's Development of Autonomous Surface Vessels

17.     Founded in 2022, Saronic is a U.S. maritime technology company that specializes in designing, developing, and producing Autonomous Surface Vessels ("ASVs") – often described as maritime drones – for naval and maritime applications. These autonomous vessels combine advanced hardware, software, and artificial intelligence to enhance domain awareness, extend operational reach, and improve survivability in maritime environments. Saronic products include a range of scalable unmanned surface vessels, such as smaller tactical units and larger long-range platforms capable of carrying significant payloads and supporting diverse missions.

18.     Saronic has secured government contracts to collaborate on autonomous maritime systems. As a small, nontraditional contractor, Saronic's government awards have been primarily under procurement mechanisms like Other Transaction Authority ("OTA") arrangements.

19.     OTAs are specialized, flexible contracting vehicles — not subject to the Federal Acquisition Regulation ("FAR") – used to acquire research and prototypes quickly, often from nontraditional government contractors. These agreements allow for streamlined, customized terms to foster innovation and speed. There are three types of OTAs: Research OTs provide for basic, applied, and advanced research projects; Prototype OTs extend the research OTA to development of a prototype; and Production OTs allow a competitively awarded prototype OT to segue into the

production phase without the need for additional competition, assuming other specific requirements are satisfied.





Defense Secretary Pete Hegseth has ordered all the service branches to move quickly on adoption of autonomous technology and to cut "red tape" to speed up procurement. This initiative is in line with the Trump Administration's recent Executive Order, "Ensuring Commercial, Cost-Effective Solutions in Federal Contracts," aimed at eliminating waste associated with Government-unique contracting by establishing a "commercial-first" policy

---

[3] "Saronic Secures $392M Unmanned-Vessel Contract From the U.S. Navy," THE MARITIME EXECUTIVE, *available at* https://maritime-executive.com/article/saronic-secures-392m-unmanned-vessel-contract-from-the-u-s-navy (Dec. 8, 2025).

requiring agencies to procure commercially available products and services — including those that can be modified to meet agency needs – "to the maximum extent practicable."[4]

27.     Executive Order 14271 states that it is the policy of this Administration "that agencies shall procure commercially available products and services, including those that can be modified to fill agencies' needs, to the maximum extent practicable, including pursuant to the Federal Acquisition Streamlining Act of 1994 (Public Law 103-355, as amended) (FASA)." One relevant part of FASA is enacted at 10 U.S.C. § 3453, which also establishes a mandatory preference for acquiring commercial products and commercial services "to the maximum extent practicable" to meet the Government's requirements.

28.     To implement this policy, the Executive Order imposes both retrospective and prospective controls on non-commercial procurements. As applicable here, whenever an agency proposes to solicit a non-commercial product or service, the contracting officer must provide the "Approval Authority" with, *inter alia*, the specific reasons a non-commercial solution is required, and all supporting market research and price analysis. Only when the Approval Authority approves the proposal in writing can the agency pursue a non-commercial procurement. For the purposes of Executive Order 14271, "Approval Authority" means the senior procurement executive, designated pursuant to 41 U.S.C. 1702(c), who is responsible for management direction of the acquisition system of an agency.

---

[4] Exec. Order No. 14271, 90 Fed. Reg. 16433.

29. Executive Order 14271 explained the importance for obtaining approval from requisite levels:

> Previous administrations evaded statutory preferences and abused the Federal contracting framework by procuring custom products and services where a suitable or superior commercial solution would have fulfilled the Government's needs. Doing so simultaneously stifled the integration of commercially available innovations in Government procurement while increasing Government spending, resulting in avoidable waste and costly delays to the detriment of American taxpayers.

30. The Saronic OTA award exemplifies the "gold standard" for procurement pursuant to the intentions of recent Executive Order 14271. With Saronic's OTA, Navy Secretary John Phelan said in a social media statement "[w]ith Saronic, we went from prototype to production in under a year. That's rapid innovation, real competition, and combat power in sailors' and marines' hands, not on PowerPoints."[5]

31. Saronic has a Commercial Price List that includes these types of services on its sUSVs. ██████████████████████████████████

██████████████

**The Solicitation**

32. Despite Executive Order 14271's focus on Commercial item procurements and the precedent established by Saronic's OTA for the sUSV, on January 16, 2026, NAVSEA issued the

---

[5] "Saronic Secures $392M Unmanned-Vessel Contract From the U.S. Navy," THE MARITIME EXECUTIVE, *available at* https://maritime-executive.com/article/saronic-secures-392m-unmanned-vessel-contract-from-the-u-s-navy (Dec. 8, 2025).

Solicitation for O&S for the LCS MMs and sUSVs as a FAR Part 15, non-commercial procurement. *See* Ex. 2.A.

33.    The Solicitation contemplates that the resulting awardee will perform comprehensive support and maintenance to ensure the readiness and mission effectiveness of all systems, equipment, software, and infrastructure related to the LCS MM and sUSVs. This will include, *inter alia*, ███████████████████████████████████████████ ████████████████████████████████████████ *See* Ex. 2.B.

34.    LCSs are small, fast warships used by the United States Navy to handle modern, fast-moving threats in small waters. A key concept behind the LCS is modularity, meaning that instead of building separate ships for separate jobs, the Navy designed LCS to use mission packages that could be swapped out. These packages focus on Mine Countermeasures ("MCM"), Surface Warfare ("SUW"), and Command, Control, Communications, Computers, Cyber-Defense, and Intelligence ("C5I") support capabilities. LCS ships are typically crewed warships; they are not autonomous.

35.    However, under the Solicitation, the LCS Program has expanded to include unmanned systems as part of its mission packages. Operations support and maintenance of the Corsair – *i.e.*, the sUSV that was recently praised by the Defense Secretary for being developed and maintained without the "red tape" of non-commercial, FAR 15 procurements – is now being engulfed by the significantly larger LCS contracting program.

36.    As is typical with most non-commercial FAR 15 procurements, the Solicitation includes a variety of labor-intensive proposal requirements and post-award obligations that have the tendency to narrow the competition pool to a few large, traditional defense contractors.

37.    The Solicitation states that Offerors shall structure proposal submittals such that the required content is organized as follows:

| Table L1 – Volume Descriptions | | | |
|---|---|---|---|
| Volume | Title | Page Limit | Electronic Submission (via PIEE) |
| I | SF33/ Completed Contract (identified in 3.1) | None | 1 |
| II | Executive Summary (identified in 3.2) | 2 | 1 |
| III | Technical Proposal (identified in 3.3) | 70 | 1 |
| | Factor 1: Technical Approach (Section 3.3.1) | 40 | |
| | Element 1: Specific and Relevant Experience/Expertise in Key Scope Areas | Part of 40-page count | |
| | Element 2: Emergent Repair Response & Maintenance Availability Planning/Execution Scenario | Part of 40-page count | |
| | Factor 2: Management Plan (Section 3.3.2) | 30 | |
| | Element 1: Program Management Approach / Overhead Plan | Part of 30-page count | |
| | Element 2: Subcontract Management Plan | Part of 30-page count | |
| | Element 3: Staffing Plan | Part of 30-page count | |
| IV | Factor 3: Past Performance (identified in 3.4) | See Note 1. | 1 |
| V | Factor 4: Data Rights (identified in 3.5) | None | 1 |
| VI | Factor 5: TOTAL EVALUATED COST/PRICE (TEC/P) (COST/PRICE VOLUME) (identified in 3.6) | None | 1 |

Ex. 2.C at 6-7.

38.    The Solicitation states that an Offeror's proposal shall be "sufficiently detailed to enable Government evaluation members to make a thorough evaluation against specific factors established in Section M." Ex. 2.A at 87; Ex. 2.C at 10. The Solicitation further explains that Factor 1 "Technical Approach," Factor 2 "Management Approach," and Factor 4 "Data Rights" will each be evaluated and provided an adjectival rating. Ex. 2.A at 108; Ex. 2.C at 30. Factor 3

"Past Performance" will be evaluated on an "Acceptable/Unacceptable" basis. *Id.* The Solicitation describes the relative importance of each Factor as follows:

> The evaluation of Factor 1 is more important than Factor 2. The evaluation of Factor 2 is more important than Factor 4. Factor 3 will be evaluated on an acceptable/unacceptable basis. All non-priced factors, when combined, are significantly more important than the Total Evaluated Price/Cost (Factor 5). However, as competing proposals approach equality in the non-price factors (Factors 1, 2, 3, and 4), the Total Evaluated Cost/Price (Factor 5) will increase in importance.

*Id.*

39.     As relevant here, the Solicitation includes predominantly "cost-type" CLINs, *see* Ex. 2.A at 2-13, and incorporates associated clauses typical only to major defense acquisition programs or those procurements subject to Cost Accounting Standards ("CAS"). For example, the Solicitation includes Defense Federal Acquisition Regulation Supplement ("DFARS") clause 252.234-7004 "Cost and Software Data Reporting System," which requires contractors to implement and maintain a structured cost and software data reporting process that produces timely contractor cost data reports and software reports using only government-approved forms as the basis for reporting. *Id.* at 52. The Solicitation also includes DFARS 252.242-7005 "Contractor Business Systems" and -7006 "Accounting System Administration," which require contractors to establish and maintain an approved accounting system and a material management and accounting system – systems not standard in and not required of the commercial space. *Id.*

40.     In relation to this, Solicitation proposal instructions require offerors to provide substantiating data for every major cost element (*e.g.*, labor rates/hours, materials, fringe, overhead, General and Administrative ("G&A"), subcontracts) in relation to certain CLINs. Ex.

2.A. at 100; Ex. 2.C at 23. Offerors must submit a full cost build-up using a government provided attachment for all cost-reimbursement CLINs, along with a substantiating cost narrative to document assumptions and justify reasonableness. Ex. 2.A at 100-101, 103; Ex. 2.C at 23-25. Offerors must also complete and submit separate contractor accounting system and contractor compliance checklists, to provide the source of approval, the latest dates, and the current status in which the offeror had: an "approved Accounting System," an "approved Purchasing System," an "approved Estimating System," and a "determination of Adequacy on the Offeror's Disclosure Statement." Ex. 2.A at 105-106; Ex. 2.C at 28. Failure to provide specifically requested data can render the offeror ineligible for award. Ex. 2.A at 113; Ex. 2.C at 35.

41. The Solicitation also includes IP clauses and proposal requirements that stifle private innovation and penalize commercial contractors. For example, here, the Government made one of the evaluation factors dependent on the level of rights in Technical Data / Computer Software / Computer Software Documentation ("TD/CS/CSD") the offeror is willing to provide. Specifically, the Solicitation states:

> The Offeror shall describe the extent to which proprietary or otherwise limited or restricted components, subsystems, interfaces, and software are used. For rights in Technical Data/Computer Software/Computer Software Documentation (TD/CS/CSD),the Contractor shall explain the degree to which the proposal provides the level of technical data rights (commercial and noncommercial) and rights in computer software that will enable the Navy to sustain the Littoral Combat Ship (LCS) Mission Modules (MM) and Small Unmanned Surface Vessels (sUSVs) over the including but not limited to maintenance, repair, overhaul, modernization, and upgrades, throughout their lifecycles. *If an Offeror proposes to deliver any commercial or noncommercial TD/CS/CSD with less than Government Purpose Rights (GPR), the Offeror shall describe the impact on the Government's ability to use, modify, release or disclose such TD, CS, or CSD.* The use of proprietary algorithms, designs, processes or interfaces shall be described. The Offeror shall provide justification and rationale for all intellectual property and data rights assertions.

Ex. 2.A at 98; Ex. 2.C at 21 (emphasis added).

42.     Pursuant to DFARS 252.227-7013 "Rights in Technical Data - Other than Commercial Products or Commercial Services," Government Purpose Rights or "GPR" means the right to (1) Use, modify, reproduce, release, perform, display, or disclose technical data within the Government without restriction; and (2) Release or disclose technical data outside the Government and authorize persons to whom release or disclosure has been made to use, modify, reproduce, release, perform, display, or disclose that data for United States Government purposes.

43.     The Solicitation then states the Government "desires at least a Government Purpose Rights (GPR) license" in all non-commercial technical data or computer software — explicitly including object code, executable code, and source code - to enable sustainment and competitive follow-on support. Ex. 2.A at 99, 110; Ex. 2.C at 21, 32.

44.     The Solicitation then explains that if offerors provide less than the level of rights desired by the Government for non-commercial *and commercial* TD/CS/CSD, the Government will evaluate such rights accordingly:

> In the event an Offeror (including its sub-Offerors or suppliers, or potential sub-Offerors or suppliers, at any tier) proposes to deliver *any commercial* or noncommercial TD/CS/CSD with less than such license rights as desired by the Government (identified under Section M), the Government will evaluate the potentially adverse impact on the Government's ability to use, modify, release, or disclose such TD, CS, or CSD.

Ex. 2.A at 99; Ex. 2.C at 21 (emphasis added).

45.     Although the Solicitation states that proposals will not be unacceptable solely for offering less than GPR, it also states the Government will evaluate the adverse impact of less than

desired rights and consider that impact in its award determination: "Further, the Government will consider the adverse impact of less than the license rights desired by the Government in the best value determination." *Id.*

46.     For items offered with less than desired rights, the Government also requests a buyout option that would allow it to obtain the desired level (*e.g.*, GPR). *Id.* Thus, the evaluation scheme creates strong incentive to offer GPR or a path to GPR. Put another way, if an offeror does *not* offer at least GPR or a buyout path, the offeror is more likely to be treated as a sustainment/competition risk, materially lowering the offeror's rating and chances for award.

47.     The Solicitation states that "[t]he Government intends to award a single contract to the responsive and responsible Offeror whose proposal represents the best value to the Government." Ex. 2.A at 113; Ex. 2.C at 35.  It explains that "[t]he best value to the Government is that proposal that meets the requirements of this solicitation and that is determined to be the most advantageous to the Government, considering all of the evaluation factors. The best value proposal will be selected using a tradeoff process." *Id.*

48.     Pursuant to the Solicitation, perspective offerors were entitled to submit questions on the Solicitation requirements no later than "24 Calendar days after the date the original solicitation," *id.* at 83, or by February 9, 2026.

49.     Saronic – an interested and perspective offeror – submitted several questions related to these and other issues and received the following responses:

> **Question 35:** Please explain whether the Government considered procuring some or all of these services through the commercial marketplace in accordance with 10

USC 3453 and Executive Order 14271 and how it determined such services were not commercially available?

**Agency Response:** The submitted question pertains to pre-solicitation acquisition planning and is therefore outside the scope of this RFP solicitation. All offerors are advised to prepare their proposals based on the requirements as stated in the solicitation.

**

**Question 36:** Would the Government please explain its rationale for consolidating/bundling the maintenance and sustainment of LCS Mission Module (MM) requirements with the maintenance and sustainment of sUSV requirements in the final solicitation?

**Agency Response:** The submitted question pertains to pre-solicitation acquisition planning and is therefore outside the scope of this RFP solicitation. All offerors are advised to prepare their proposals based on the requirements as stated in the solicitation.

**

**Question 37:** Please confirm whether the Government determined that there was not a reasonable expectation that at least two responsible small businesses could perform this requirement or the draft RFP. Please also identify the market research conducted and any coordination with or concurrence from the SBA supporting the decision not to set this procurement or the separate draft RFPs aside for small business.

**Agency Response:** The submitted question pertains to pre-solicitation acquisition planning and is therefore outside the scope of this RFP solicitation. All offerors are advised to prepare their proposals based on the requirements as stated in the solicitation.

**

**Question 40:** Is the Government willing to accept commercial vendors' established Commercial Price Lists in lieu of subcontractor cost realism or cost reasonableness justifications, consistent with commercial item contracting principles and DoW guidance?

**Agency Response:** The Government cannot advise an offeror in its conduct or submission of proposals. Refer to Section L for instructions on proposal submissions.

**

SMRH:4905-2779-2274.5

**Question 41:** The Government indicates a desired level of license rights (GPR) in various products to be used/delivered under this contract. Given that the contract scope includes commercial item systems and platforms, the products and data that the Government seeks is likely available commercially and licensable to the Government. This approach appears to contradict DoW's stated policy/preference for commercial item acquisitions. What is the basis for the Government's preference for GPR data rights if an offeror is able to acquire commercial use rights to third-party products and data adequate to fulfill the requirements as expressed in the SOW?

**Agency Response:** As stated in Section M 2.3.1, "The Government will evaluate Data Rights licenses using information in the proposal to assess the extent to which the license rights in noncommercial and commercial Technical Data (TD), Computer Software (CS), and Computer Software Documentation (CSD) offered to the Government affect the cost effective operation and overall sustainment of the LCS MM and sUSVs including but not limited to maintenance, repair, overhaul, modernization, and upgrades, throughout their lifecycles." For commercial TD, CS, and CSD, the Government will evaluate the extent to which the data rights licenses meet this intent. The Government will evaluate each item of TD, CS, and CSD at the most favorable level of rights offered. Refer to Section M 2.3.1 for more information regarding the evaluation of data rights assertions.

Ex. 2.D (Sol. Q&A) at 5-6.

50.    On February 18, 2026, the Agency issued Amendment 0001 extending the proposal due date to 4:00 PM ET, March 4, 2026. *See* Ex. 2.C at 1.

## GROUNDS FOR PROTEST

### COUNT I

**The Agency Failed to Follow 10 U.S.C. § 3453, Preference for Commercial Products and Commercial Services, as Reinforced in Executive Order 14271, Ensuring Commercial, Cost-Effective Solutions In Federal Contracts, When Issuing the Solicitation**

51.    Saronic realleges and incorporates the facts and allegations contained in the preceding Paragraphs of this Complaint as if fully set forth herein.

52.     Enacted as part of the Federal Acquisition Streamlining Act of 1994 ("FASA"), 10 U.S.C. § 3453 establishes a mandatory preference for acquiring commercial products and commercial services "to the maximum extent practicable" to meet the Government's requirements.

53.     Under 10 U.S.C. § 3453, agencies are required to define its requirements "so that commercial services or commercial products…may be procured to fulfill such requirements; and [ ] offerors of commercial services, commercial products, and nondevelopmental items other than commercial products are provided an opportunity to compete in any procurement to fill such requirements." 10 U.S.C. § 3453(a).

54.     Additionally, agencies are required to take the following steps to maximize the acquisition of commercial products and commercial services:

(1)     acquire commercial services, commercial products, or nondevelopmental items other than commercial products to meet the needs of the agency;

(2)     require prime contractors and subcontractors at all levels under the agency contracts to incorporate commercial services, commercial products, or nondevelopmental items other than commercial products as components of items supplied to the agency;

(3)     modify requirements in appropriate cases to ensure that the requirements can be met by commercial services or commercial products or, to the extent that commercial products suitable to meet the agency's needs are not available, nondevelopmental items other than commercial products;

(4)     state specifications in terms that enable and encourage bidders and offerors to supply commercial services or commercial products or, to the extent that commercial products suitable to meet the agency's needs are not available, nondevelopmental items other than commercial products in response to the agency solicitations;

(5)     revise the agency's procurement policies, practices, and procedures not required by law to reduce any impediments in those policies, practices, and procedures to the acquisition of commercial products and commercial services;

(6)     require training of appropriate personnel in the acquisition of commercial products and commercial services; and

(7)    establish criteria in performance evaluations for appropriate personnel to reward risk-informed decisions that maximize the acquisition of commercial products, commercial services, or nondevelopmental items other than commercial products.

10 U.S.C. § 3453(b).

55.    Finally, before soliciting proposals, agencies are required to conduct market research "to determine whether there are commercial services or commercial products or, to the extent that commercial products suitable to meet the agency's needs are not available, nondevelopmental items other than commercial products available that- (A) meet the agency's requirements; (B) could be modified to meet the agency's requirements; or (C) could meet the agency's requirements if those requirements were modified to a reasonable extent."  10 U.S.C. § 3453(c)

56.    Additionally, President Donald Trump issued Executive Order 14271 entitled "Ensuring Commercial, Cost-Effective Solutions In Federal Contracts" on April 16, 2025. The purpose of this Executive Order is to "eliminate unnecessary and imprudent expenditures of taxpayer dollars" by enforcing "existing laws directing the Federal Government to utilize, to the maximum extent practicable, the competitive marketplace and the innovations of private enterprise to provide better, more cost-effective services to taxpayers." Exec. Order No. 14271, Sec. 1.

57.    Executive Order 14271 states that it is the policy of this Administration "that agencies shall procure commercially available products and services, including those that can be modified to fill agencies' needs, to the maximum extent practicable, including pursuant to the Federal Acquisition Streamlining Act of 1994 (Public Law 103-355, as amended) (FASA)." Exec.

Order No. 14271, Sec. 2. Thus, the Executive Order further implements and re-enforces the requirements of 10 U.S.C. § 3453.

58.    The Executive Order directs all contracting officers to seek approval if they propose to solicit a non-commercial product or service. The contracting officer must include a description of the procurement and the specific reasons a non-commercial product or service is required, including all market research and price analysis in support of the proposed solicitation for such product or service.  Exec. Order No. 14271, Sec. 5.

59.    In issuing the Solicitation here, NAVSEA violated the requirements of 10 U.S.C. § 3453 and the enforcing mechanisms of Executive Order 14271.

60.    First, the Agency did not properly conduct market research to determine whether there are commercial services that meet the agency's requirements.  10 U.S.C. § 3453(c).

61.    If the Agency had conducted market research in accordance with 10 U.S.C. § 3452(c), it would have determined that offerors like Saronic can provide commercial O&S services for the sUSVs, and the Agency could have procured such services from the commercial marketplace in accordance with 10 U.S.C. § 3452 and Executive Order 14271. Specifically, the Agency entered into the OTA with Saronic that produced the sUSVs and development of the operational maintenance and sustainment support systems for the sUSVs, and thus, should have known such services were commercially available.

62.    Second, the Agency did not define its requirements "so that commercial services or commercial products…may be procured to fulfill such requirements; and [ ] offerors of

commercial services, commercial products, and nondevelopmental items other than commercial products are provided an opportunity to compete in any procurement to fill such requirements." 10 U.S.C. § 3453(a).

63.     Instead of identifying and segregating services that could be fulfilled by offerors of commercial services in accordance with 10 U.S.C. § 3453 and Executive Order 14271, the Agency bundled together a variety of tasks that, when combined, can only be performed by a large, non-commercial, traditional defense contractor.

64.     Additionally, the Agency has incorporated terms and conditions into the Solicitation that preclude commercial service providers from competing, in violation of 10 U.S.C. § 3453(b).

65.     Specifically, the Agency made all O&S CLINS Cost-Plus-Fixed-Fee, and the Solicitation requires offerors to submit substantiating cost data in their proposals that commercial and nontraditional vendors cannot provide.  Ex. 2.A at 100; Ex. 2.C at 23.  The Solicitation also requires offerors to complete and submit a separate contractor accounting system and contractor compliance checklists, to provide the source of approval, the latest dates, and the current status in which the offeror had: an "approved Accounting System," an "approved Purchasing System," an "approved Estimating System," and a "determination of Adequacy on the Offeror's Disclosure Statement." Ex. 2.A at 105-106; Ex. 2.C at 28.  Again, systems and filings not typically required when purchasing commercial services.

66.     In the Solicitation, the Agency has also given preference to offerors that can provide Government Purpose Rights in technical data and said that offerors would receive "a more

favorable evaluation depending on the rights asserted." Ex. 2.A. at 110; Ex. 2.C at 32. The Solicitation explicitly states that if offerors proposes to deliver commercial TD/CS/CSD with less than the desired level of rights, the Government will consider the adverse impact of such rights in its best value determination. Ex. 2.A at 99; Ex. 2.C at 21. This evaluation scheme not only discourages commercial offerors from competing, but actually penalizes them in the competition if they assert their commercial rights in their technical data and computer software. Thus, these Solicitation terms violate the mandate in 10 U.S.C. § 3453(b) because they actually preclude commercial providers from participating in a fair competition.

67.    Finally, based on all evidence in public procurement databases, we see no indication that the Agency sought approval for its decision to combine and procure O&S services for the LCS MM and commercial O&S services for USVs in one, non-commercial Solicitation as required by Executive Order 14271. Thus, the Agency also failed to follow the Executive Branch's own internal controls designed to ensure commercial preference compliance further demonstrating the unreasonable nature of its actions.

68.    Where an agency does not properly follow the statutory and executive order mandates for commercial item preferences when there is evidence that a commercially available alternative exists, this Court will sustain the protest. *See Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 282 (2016).

## COUNT II

### Certain Terms of the Solicitation Are Unduly Restrictive on Competition

69.    Saronic realleges and incorporates the facts and allegations contained in the preceding Paragraphs of this Complaint as if fully set forth herein.

70.    The Competition in Contracting Act ("CICA") "demands that agencies 'create specifications that solicit proposals 'in a manner designed to achieve full and open competition.'"" *Am. Safety Council, Inc. v. United States,* 122 Fed. Cl. 426, 435 (2015). "A procuring agency is required to specify its needs in a manner designed to promote full and open competition, and may only include restrictive provisions in a solicitation to the extent necessary to meet the agency's minimum needs." *Omega World Travel,* B-258374, 1995 WL 19607 (Comp. Gen. Jan. 13, 1995). "Where a protester challenges a specification as unduly restrictive of competition, it is the agency's responsibility to establish that the specification is reasonably necessary to meet its minimum needs." *Id.; see also Global SuperTanker Services, LLC,* B-414987 et al, 2017 WL 5185333 (Comp. Gen. Nov. 6, 2017) ("[T]he procuring agency has the burden to establish that the specification is reasonably necessary to meet its needs."). "The question becomes whether the restrictions are required to meet the Government's minimum needs." *Am. Safety Council, Inc.,* 122 Fed. Cl. at 435. The adequacy of an agency's justification for a restrictive solicitation term is examined to ensure that it is rational and can withstand logical scrutiny. *See Piedmont Propulsions Systems, LLC v. United States,* 167 Fed. Cl. 72, 82 (2023). If the Court determines that a solicitation requirement "violates the prohibition against restrictive terms that are not required to meet the government's minimum needs, the requirement [will be] deemed to be unduly restrictive and [the] agency's decision to include the requirement in the solicitation will be found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. *Id.* at 83 (citing *Parcel 49C Limited Partnership v. United States,* 130 Fed. Cl. 109, 125 (2016)).

71.     Saronic challenges the following terms of the Solicitation as unduly restrictive on competition:

**A.      The Agency's Decision to Combine O&S for the LCS MM and the sUSVs is Unduly Restrictive of Competition**

72.     The Agency's decision to combine O&S for the LCS MM and O&S for the sUSVs into one Solicitation is unduly restrictive of competition because it excludes all offerors that could provide commercial O&S services for the sUSVs, but not when such services are combined with the large LCS MM system. Moreover, it appears to incentivize offerors to engage in software development efforts – at the Government's expense – to displace the commercial services already available.

73.     Because bundled procurements can restrict competition, a challenge to the agency's use of such an approach will be sustained where the bundling of requirements if not necessary to satisfy the agency's needs. *Vantex Service Corp.,* B-290415, 2002 WL 1820581 (Comp. Gen. Aug. 8, 2002); *see also National Customer Engineering,* B-251135, 1993 WL 86835 (Comp. Gen. Mar.11, 1993). Bundling is only upheld where it is tailored to a concrete agency requirement. *National Customer Engineering,* B-251135, 1993 WL 86835.

74.     Here, there is no rational Agency need to combine the O&S services for the LCS MM and the sUSVs. As explained above, the LCS and sUSVs are separate and distinct systems. sUSVs are not part of the LCS. The SOW describes the support for sUSVs as including "██████████████████████████████████████████████" Ex. 2.B at 2, but this does not mean that the a single contractor needs to provide O&S services for both

LCS and sUSVs. A contractor can provide O&S services for the sUSVs and ensure they can integrate with LCS-based operations.

75.     When asked during the procurement to explain its rationale for consolidating/bundling the maintenance and sustainment of the LCS MM requirements with the maintenance and sustainment of the sUSVs, the Agency did not provide a valid rationale. Ex. 2.D at Q#35. Instead, the Agency stated only that "[t]he submitted question pertains to pre-solicitation acquisition planning and is therefore outside the scope of this RFP solicitation." *Id.*

76.     There is simply no reasonable need for the Agency to combine the LCS O&S services and the sUSVs O&S services into one procurement and doing so clearly and unnecessarily restricts competition to only large, traditional defense contractors that can handle all of these services.

**B.     The Solicitation's Cost Disclosure Related Requirements are Unduly Restrictive of Competition**

77.     The Solicitation's O&S CLINS are all Cost Plus Fixed Fee ("CPFF"). As a result, the Solicitation contains numerous cost proposal requirements that cannot be met by commercial companies and nontraditional government contractors.

78.     For example, the Solicitation includes DFARS 252.234-7004 "Cost and Software Data Reporting System," which requires contractors to implement and maintain a structured cost and software data reporting process that produces timely contractor cost data reports and software reports using only government-approved forms as the basis for reporting. Ex. 2.A at 52.

79.     The Solicitation also includes DFARS 252.242-7005 "Contractor Business Systems" and -7006 "Accounting System Administration," which require contractors to establish and maintain an approved accounting system and a material management and accounting system – systems not standard in commercial companies. *Id.*

80.     In relation to this, Solicitation proposal instructions require offerors to provide substantiating data for every major cost element (*e.g.*, labor rates/hours, materials, fringe, overhead, General and Administrative ("G&A"), subcontracts) in relation to certain CLINs. Ex. 2.A. at 100; Ex. 2.C at 23. Offerors must also submit a full cost build-up using a government provided attachment for all cost-reimbursement CLINs, along with a substantiating cost narrative to document assumptions and justify reasonableness. Ex. 2.A at 100-101, 103; Ex. 2.C at 23-25.

81.     Offerors must also complete and submit separate contractor accounting system and contractor compliance checklists, to provide the source of approval, the latest dates, and the current status in which the offeror had: an "approved Accounting System," an "approved Purchasing System," an "approved Estimating System," and a "determination of Adequacy on the Offeror's Disclosure Statement." Ex. 2.A at 105-106; Ex. 2.C at 28. Failure to provide specifically requested data can render the offeror ineligible for award. Ex. 2.A at 113; Ex. 2.C at 35.

82.     Commercial contractors and nontraditional government contractors do not typically maintain, and thus cannot provide, this level of cost data. They typically do not have approved systems or substantiating data for every cost element. Commercial contractors ordinarily support

their prices with established Commercial Price Lists, but the Solicitation does not allow offerors to use such data to substantiate costs.

83.     When asked if the Government would accept commercial vendors' established Commercial Price Lists in lieu of subcontractor cost realism or cost reasonableness justifications, consistent with commercial item contracting principles and Department of War guidance, the Agency simply stated that it cannot advise an offeror on its conduct or submission of proposals and referred offerors to Section L for instructions.  Ex. 2.D at Q#40.

84.     The Government cannot provide a rational basis for its decision to make all O&S tasks CPFF and require offerors and subcontractors to submit substantiating cost data and proof of approved accounting systems, especially where at least some of these services are available on the commercial marketplace for established commercial prices.  Cost reimbursement is typically reserved for procurements when the Government does not know how much something will cost. It is not the preferred method of payment for services with established commercial prices.

85.     The Agency's use of these cost requirements is therefore, unduly restrictive on competition because it excludes commercial and nontraditional contractors from competing.

## C.    The Solicitation's Data Rights Requirements are Unduly Restrictive on Competition

86.     The Solicitation states that the Agency desires Government Purpose Rights ("GPR") in all commercial and non-commercial TD/CS/CSD and if an offeror proposes less than GPR, it will be evaluated unfavorably in the best value determination.  Ex. 2.A at 99; Ex. 2.C at 21. Thus, although the Solicitation does technically allow offerors to propose less than GPR, doing

so will result in an unfavorable evaluation, thereby effectively mandating all offerors provide GPR to remain competitive.

87.     These data rights requirements are unduly restrictive on competition because they exclude commercial contractors who do not ordinarily provide GPR in their TD/CS/CSD, and these requirements do not serve the Agency's minimum needs.

88.     As explained above, Saronic's Corsair sUSV is a commercial product that was produced under an OTA ███████████████████████████ ████████████████████████████████████████████ ██████████████ Saronic's O&S services for its sUSV are commercial services.

89.     The Solicitation's desire for GPR in all TD/CS/CSD, including commercial TD/CS/CSD thus, makes it unduly burdensome on commercial vendors that do not ordinarily grant such rights in their data or computer software and cannot do so and still remain competitive in the commercial marketplace. Under GPR, the Government can release the commercial TD/CS/CSD outside the Government to competitors.

90.     Additionally, the Government cannot state a rational basis for requiring such data rights in commercial TD/CS/CSD. The Solicitation states that the Government needs GPR to sustain the LCS MM and sUSVs "including but not limited to maintenance, repair, overhaul, modernization, and upgrades, throughout their lifecycles." Ex. 2.A at 98; Ex. 2.C at 21. But the Agency combines commercial sUSVs and non-commercial products together in making this statement. When the Government procures commercial products or services, it ordinarily obtains commercial rights in TD/CS/CSD and is able to maintain, repair, overhaul, modernize, and

upgrade its products within the bounds of the data rights its obtains. Thus, the Government cannot explain how requiring GPR in commercial TD/CS/CSD is necessary to meet its minimum needs. *See Am. Safety Council, Inc.*, 122 Fed. Cl. at 438 (finding a solicitation's IP clause unduly burdensome and unnecessary to meet the Government's needs).

## COUNT III

### The Operation and Sustainment of sUSVs Must Be Set Aside for Small Businesses

91.    Saronic realleges and incorporates the facts and allegations contained in the preceding Paragraphs of this Complaint as if fully set forth herein.

92.    The "Rule of Two" requires the Agency to set aside the O&S for sUSVs for small businesses if there is a reasonable expectation that offers will be received from at least two responsible small business concerns and award will be made at fair market prices. *See* 16 U.S.C. § 644(j) and FAR 19.502-2. There are multiple U.S. small businesses, in addition to Saronic — *e.g.*, Maritime Tactical Systems, Inc., HAVOC AI, United States Marine, Inc., and Maritime Applied Physics Corporation — who manufacture and deliver sUSVs and provide O&S services.

93.    Thus, it is reasonable to expect that two or more responsible small businesses would submit proposals.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, Saronic Technologies, Inc. requests this Court grant judgment in its favor and grant the following relief:

1.  Enter a permanent injunction prohibiting the Agency from proceeding with or awarding a contract under the Solicitation;

2. Declare that the Agency failed to follow the requirements of 10 U.S.C. § 3453 and the enforcement mechanisms of Executive Order 14271 when it issued the Solicitation combining O&S for LCS MM and sUSVs when such services for the sUSVs could be procured through the commercial marketplace;

3. Declare that the Agency's decision to combine O&S for the LCS MM and the sUSVs into one solicitation was unduly restrictive, and contrary to law, and require the Agency to revise the Solicitation to comply with applicable law;

4. Declare that the Solicitation's cost requirements are unduly restrictive, and contrary to law, and require the Agency to revise the Solicitation to comply with applicable law;

5. Declare that the Solicitation's Data Rights requirements are unduly restrictive, and contrary to law, and require the Agency to revise the Solicitation to comply with applicable law;

6. Declare that the O&S services for the sUSVs must be set aside for small businesses; and

7. Award Saronic such other and further relief as the Court may deem just and proper.

Respectfully Submitted,

DocuSigned by:

*Anne Perry*

E1032B55CE3A4D3...

Anne B. Perry
Attorney for Saronic Technologies, Inc.
Sheppard Mullin Richter & Hampton LLP
2099 Pennsylvania Avenue, NW, Suite 100
Washington, DC 20006-6801
Telephone: (202) 747-1913
Facsimile: (202) 747-3802
Email: aperry@sheppardmullin.com

Of Counsel:
Ryan E. Roberts
Katie A. Calogero
Christie M. Alvarez
Sheppard Mullin Richter & Hampton LLP

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Plaintiff's Sealed Complaint, filed via electronic filing with the Court on March 4, 2026, was served on March 4, 2026, upon the following via email:

U.S. Department of Justice
Commercial Litigation Branch
1100 L Street, NW, 8th floor
Washington, DC 20530
E-mail: nationalcourts.bidprotest@usdoj.gov

DocuSigned by:

*Anne Perry*

E1032B55CE3A4D3...

Anne B. Perry
Attorney for Saronic Technologies, Inc.
Sheppard Mullin Richter & Hampton LLP
2099 Pennsylvania Avenue, NW, Suite 100
Washington, DC 20006-6801
Telephone:  (202) 747-1913
Facsimile: (202) 747-3802
Email: aperry@sheppardmullin.com

Of Counsel:
Ryan E. Roberts
Katie A. Calogero
Christie M. Alvarez
Sheppard Mullin Richter & Hampton LLP

Cc:    cfc_bidprotests@cfc.uscourts.gov
       cassandra.j.brese.civ@us.navy.mil

SMRH:4905-2779-2274.5                    -33-

## TABLE OF EXHIBITS

| Number | Description |
|--------|-------------|
| 1.A | Saronic OTA N00024-25-96305 |
| 1.B | OTA Att. J-08 |
| 2.A | Sol. N00024-26-R-6311 |
| 2.B | Sol. Statement of Work |
| 2.C | Sol. Amendment 0001 |
| 2.D | Sol. Q&A |